## STOVER v. HERRINGTON, ET AL.

1. Where a mortgage states, the debt intended to be secured, at an amount greatly beyond what is due, this at most is *prima facie* evidence of fraud, and may be repelled by showing the fairness of intention *on the part of the mortgagee.*

2. A mortgagee by purchasing a part of the mortgaged property in payment of a debt not secured, does not prejudice his mortgage as to the remainder.

3. Where a mortgagee who was a surety for the payment of the debt, against which the mortgage was intended to indemnify him, executed as the surety of the mortgagor, a bond for the prosecution of a writ of error, sued out by the latter, to cause to be revised a several judgment rendered against him, upon one of the debts provided for, the mortgagee will not thereby defeat the mortgage, or in any manner affect its validity.

4. Where the principal executes a mortgage for the indemnity of his surety, and a judgment is afterwards rendered against the principal and surety for the debt intended to be secured, but before such judgment is obtained, other judgments

are rendered and executions issued, so as to create a lien upon the principal's property, the surety cannot in virtue of the lien of his mortgage, give a prefer_ ence to an execution of the plaintiff in the judgment against himself and principal; but if he would make his security available he must proceed under the mortgage.

5. A man in failing circumstances may prefer one creditor to all others, if there be no opposing liens upon his property ; and a grantee who is influenced by honest purposes cannot be prejudiced by the *mala fides* of his grantor.

6. Where a mortgagee under the impression that a judgment and execution for the debt intended to be secured, will draw to them the lien of the mortgage, causes the mortgaged property to be levied on and sold, and becomes himself the purchaser; if he afterwards discover that other liens superior to the execution under which the sale was made, attached after the mortgage was executed, he may go into equity, and foreclose the mortgage ; especially upon his stipulating that the property shall sell for as much as it did at the execution sale.

Writ of error to the Court of Chancery sitting in Wilcox.

In March, 1842, the plaintiff in error filed his bill against the defendants, setting forth that on the twenty-fourth of March, 1838, the defendant, Herrington, conveyed to him several tracts of land, (all of which are particularly described,) situate in the county of Wilcox, and sundry slaves, whose names and ages are respectively stated. This conveyance is conditional and avowedly for the purpose of securing the payment of three promissory notes, bearing even date therewith : the first, for the sum of twenty-seven hundred dollars, and payable on the first day of May, 1839 ; the others for the sum of eight thousand, six hundred and fifty dollars, each, payable, the one on the first day of May, 1840, and the other on the first day of May, 1841. These notes were made in the presence of witnesses, at the time of the execution of the mortgage, with the express understanding and agreement that the mortgage was given to indemnify the complainant for all liabilities he was under for the mortgagor: and the aggregate amount of the notes it was agreed should be twenty thousand dollars, because the precise amount of the complainant's engagements for the defendant could not then be ascertained.

It is further stated, that among other liabilities for Herrington, the complainant was his security on two promissory notes, payable to Samuel Snipes, each for three thousand, three hundred and thirty-three dollars, dated the eighth of May, 1836, and payable, the one on the first day of January, 1838, and the other on the first of January, 1839. Both of these notes have

been paid by the complainant, and the amount of them (with damages and costs on the one last payable,) is now due to him, excepting such sum as the sheriff collected by the sale of Herrington's property, as hereinafter stated. Complainant believes that the mortgagor has paid all the other debts upon which he was a surety, or he has not been called on to pay them.

The complainant charges, that Herrington removed from the United States in the spring of the year 1840, carrying with him all the slaves embraced by the mortgage, saving a girl named Jane, (whom he sold to the defendant Burns, a short time previously,) and a woman named Judy. These slaves have been since sold under an execution issued on a judgment rendered against Herrington and the complainant, on the last note payable to Snipes; Jane for three hundred and thirty-five dollars, and Judy for one hundred and seventy dollars. In addition to this, the lands conveyed by the mortgage were pointed out by the complainant to the sheriff, under the impression that such was the proper course, and the same were levied on and sold for the sum of six hundred and eighteen dollars; at which sale the complainant became the purchaser. These several sums, together with the amount for which a small part of the stock were sold, were all credited on the execution before referred to.

It is also stated, that the defendant Burns, has brought an action against the complainant for the recovery of the girl Jane, or her value, which is still pending. *Further*—that after the judgment against Herrington and the complainant, had been recovered in the County Court, and about one month previous to its affirmance by the Supreme Court, (whither the case had been removed by writ of error,) the defendant Bonner, sued out an attachment returnable to the Circuit Court of Wilcox, and long after the sale under the execution as stated above, recovered a judgment against Herrington. This attachment was levied on the land in question, and the same was again levied on, and sold under an execution on Bonner's judgment. The complainant caused public notice to be given of his right to the lands at the time of their sale; notwithstanding this, Bonner became the purchaser of the same for the sum of fifty dollars.

The mortgage and notes recited in it are exhibited with the bill, and a knowledge of their existence charged to have been

communicated to both Burns and Bonner, previous to their respective purchases : in addition to which the mortgage is alledged to have been duly recorded in less than thirty days after its execution.

The prayer of the bill is, that the sale made by the sheriff of the slaves, Jane and Judy, the stock and lands to the complainant may be confirmed and allowed, or that the same be resold under the mortgage: that inasmuch as the lands, or Herrington's right of redemption therein, were sold by Bonner's direction under his execution, and purchased by him, it is prayed that he may be compelled to satisfy the complainant's demand, or to the extent of the value of the lands; and that an account be taken between the complainant and Herrington. *Further*—that Burns be enjoined from proceeding in his suit at law against the complainant; and that Herrington, Bonner and Burns each answer the bill.

Publication was made as to Herrington, who was a non-resident, and having failed to answer, the bill as to him was taken for confessed; the other defendants filed their answers. The defendant Burns, admits that Herrington made such a mortgage as is described in complainant's bill, but whether there was any understanding at the time of its execution, other than what is expressed upon its face, he does not know; but he is informed, and believes, that the three notes, which are stated as the consideration of the mortgage, were merely voluntary, and intended to furnish a pretext by which the creditors of the mortgagor might be hindered and delayed in the collection of their debts. Defendant has been informed, and believes, that when Herrington left this State, he was not in arrears to the complainant more than two hundred and sixty dollars, and that he left enough property to pay the same, on which the complainant caused an attachment to be levied in April, 1840. In respect to the complainant being surety on the two notes payable to Snipes, or otherwise bound for the debts of Herrington, or his having paid these notes, the defendant knows nothing, except as informed by the bill. When Herrington removed he left two other slaves besides Jane and Judy, who were embraced by the mortgage, viz: Bill and Charles—together with some mules, which the complainant told defendant he would take, but whether he ever did obtain possession of

them defendant does not know. After the execution of the mortgage, and previous to Herrington's removal, the complainant purchased two of the slaves, which were mortgaged to him, viz: Rachel and Maria or Mary.

The defendant further states, that the complainant and Jesse Womack purchased the note payable to Snipes, which was first payable, and that with the exception of two hundred and sixty dollars, it was paid by the mortgagee, before he left the State. This balance, with the second note, was all the complainant could claim of Herrington when he removed. The slave Jane was purchased by defendant sometime before the mortgagor's removal, and complainant did not object to it, until after that event; although defendant is informed and believes that he was informed of it: in fact, complainant remarked to him that he would have given him a bill of sale for the girl, if he had been applied to previously.

It is further stated, that the judgment of the County Court on the second note to Snipes, was rendered against Herrington alone, and that an execution issued thereon in 1839, was levied on property of value sufficient to satisfy the same—a forthcoming bond given and forfeited, and an execution issued thereon, which would have been forfeited, but for the execution of a bond for a writ of error, in which the complainant was the sole surety.

Defendant submits, that as the complainant never relied on his mortgage, but pointed out the slave Jane, with the lands, &c., to be sold under execution, whether he can now be permitted to set up his mortgage as a lien on this property.

The answer of the defendant, Bonner, is substantially the same with that of Burns, except as to the girl Jane, about whom his answer is not so full; in addition, he states, that his attachment was sued out at the time alledged, that he recovered a judgment in the fall of 1841, for the sum of four hundred and ten and 19-100 dollars, besides costs: that the execution issued thereon under which the lands in question, (which had been previously levied on by attachment) were regularly sold on the first-Monday in March, 1842, and the defendant became the purchaser for the sum of fifty dollars. Defendant admits that he had notice of the mortgage before the lands were sold, but insists, as does his co-defendant, that the same was without

consideration and voluntary, intended to hinder and delay the creditors of the mortgagor.

The testimony was taken at the instance, both of the complainant, and the defendants, Burns and Bonner, and so far as material may be thus condensed, viz: Sterrett proves the consideration of the mortgage, and the inducement to make it, to have been such as is stated in the bill. He does not know the slaves embraced by it, but one was named Jane—saw Herrington sign the three notes for twenty thousand dollars—and considers the complainant's character for integrity to be above all suspcion.

Warren states, that complainant told him he had the mortgage—it was in the only form in which Herrington would give it, yet he disliked to take it for so large an amount. Complainant said it was intended to secure all the mortgagor's property; but he did not intimate that it was designed to prevent any other creditor from collecting his debt.

Curtis says, both parties consulted him as to the propriety of executing the mortgage—he was not present when it was executed, although its execution took place at his house—and as he understood in a public manner. The girl, Jane, in controversy in this suit, is the same who is embraced in the mortgage. Knows complainant was surety for Herrington for a large sum, and that his character is unexceptionable. Complainant signed the writ of error bond, because H. sold him two negroes for $1,600, in part payment of a debt of $2,000, which he owed him. H. did not leave property enough when he removed to pay $350.

Burnett knows that the complainant has paid on the judgment recovered on the second note to Snipes, three thousand, one hundred and thirty-two dollars. Complainant said when the lands were sold under the execution in that case, that the title would be good. The stock which was left by H. sold for $270 06-100. Complainant's character was good.

Daniel estimates the value of the lands, negroes, horses and mules, conveyed by H. to have been $8,195, at the date of the mortgage; but when the last note to Snipes was payable all the property included in the mortgage would not have sold for more than about $5,000. Although the execution was levied on H's property, it was that which was mortgaged;

and H. was unable to satisfy the execution without its sale. Rachel and Maria were purchased by the complainant to pay a debt due him. Witness believes Burns knew Jane was mortgaged when he purchased her.

Gibson says, the complainant told him that he purchased Rachel and Maria of Herrington in full payment of a note, which he held against H.—to effect the purchase he had to become his surety for the writ of error; which he regretted. Witness does not recollect, but thinks the complainant paid $1,750 for these negroes.

Burt proves that the complainant told him that he put up a printed notice in different parts of the county, previous to the sale of the lands under the execution against Herrington and complainant, in which it was stated that the title of the purchaser would be good.

Jenkins states, that he wrote the notice alluded to by the last witness, under directions from complainant, who said he wished the lands to sell for their value; and they were sold under the execution against Herrington.

To so much of the evidence as tends to add to, alter, or qualify the consideration expressed on the face of the mortgage, as well as to such parts of the testimony as relates to the complainant's character, the defendants objected; and their objection was sustained.

The Chancellor was of opinion that the facts established these conclusions: 1. That Herrington was greatly embarrassed at the time the mortgage was executed. 2. That the mortgage embraced his entire estate. 3. That whatever may have been the complainant's intentions, Herrington intended to delay and hinder his creditors in the collection of their debts. 4. That the notes described in the mortgage as the inducement to its execution, were not sustained by a sufficient consideration. 5. That the judgment on the second note to Snipes might have been collected by a sale of property which H. removed, if the complainant had not prevented it by becoming his surety for a writ of error. As legal deductions from the facts it was held, that the complainant could not be allowed to prove any other consideration for the mortgage than it expressed; and that the mortgage was fraudulent: consequently the bill was dissmissed at the complainant's cost.

Stover v. Herrington, et al.

Bethea, for the plaintiff in error, insisted, that the facts did not warrant the conclusion that the mortgage was made otherwise than in good faith, at least so far as the complainant was concerned. True, it is not pretended, that the mortgagor was indebted to the complainant to the amount of the three notes, or any other certain sum, when the mortgage was executed ; but only that the latter was his surety for the payment of debts, which might or might not be less than twenty thousand dollars. And if the intention of the mortgagee was honest, and his only purpose was to indemnify himself against the consequences of his suretyship, the mortgage is clearly good. No principle of law is violated by permitting the complainant to show the extent of his liabilities or advances for the mortgagor; especially, when he shows that the reason why he received the notes was, because they could not determine with precision the amount proposed to be secured by the mortgage. [1 Ala. Rep. N. S. 29 ; Id. 736–7; 4 Kent's Com. 142–5, 163–4 ; 7 Cranch's Rep. 42.]

Sellers, for the defendant Bonner, submitted the cause on his part. Dear, for the defendant Burns, made the following points in writing :

1. The complainant should have alledged fraud in his bill, to authorize the admission of evidence to add to, or alter a written contract; such testimony would then be allowable, but the allegation must be made ; for it is a rule in equity as well as at law, that the *allegata* and *probata* must correspond. [8 Por. Rep. 211 ; 1 Ala. Rep. N. S. 160, 330 ; 2 Id. 571 ; 2 Story's Equity, 746 ; 1 Johns. Ch. Rep. 429.]

2. To authorize the proof of a consideration other than what is expressed in the writing, it should profess to be founded upon "other considerations;" for a contract cannot be partly in writing and partly by parol. [2 Plow's Rep. 292 ; 1 Ves. Rep. 127; 1 Johns. Rep. 139; 3 Id. 210, 506 ; 7 Id. 341 ; 1 Johns. Ch. Rep. 281 ; 2 Story's Equity, 746.]

3. A deed void for fraud in fact is void *in toto*, and cannot be enforced to any extent in equity, (3 Ala. Rep. 444,) nor stand as a security for subsequent advances, (4 Johns. Rep. 536, 597;) so where the first conveyance is fraudulent, and another is made for the same property in good faith and for a

valuable consideration, the latter shall prevail. [1 Alabama Rep. 237.]

4. The registration of a fraudulent mortgage cannot give to it validity, or operate as notice of its contents. By pointing out the property to the sheriff to sell under execution, the complainant impliedly admitted that it was invalid, and cannot now be permitted to set it up. [4 Stewart & Porter's Rep. 237.]

5. Where a mortgagor is in possession by the terms of the mortgage, he has a right to sell the property, and his vendee becomes entitled to all his interest. In the present case the complainant might have sold the lands, and slaves, Jane and Judy, without causing the sheriff to levy on them.

6. Where the property conveyed is greatly disproportioned to the debt intended to be secured, it affords a strong presumption of fraud. [1 Porter's Rep. 355.]

7. The party seeking to establish a deed cannot be allowed to vary it by the introduction of parol evidence. [2 Ala. Rep. 599, 600, 615.]

COLLIER, C. J.—In Shirras, et al. v. Craig & Mitchell, 7 Cranch's Rep. 34, a suit was brought for the foreclosure of a mortgage, and it was objected to the validity of the deed that it did not truly state the mortgagor's indebtedness, but greatly exaggerated it. The Court said, "It is true that the real transaction does not appear on the face of the mortgage. The deed purports to secure a debt of £30,000 sterling, due to all the mortgagees. It was really intended to secure different sums, due at the time to particular mortgagees, advances afterwards to be made, and liabilities to be incurred to an uncertain amount. It is not to be denied that a deed which misrepresents the transaction it recites, and the consideration on which it is executed, is liable to suspicion. It must sustain a rigorous examination. It is certainly always advisable fairly and plainly to state the truth. But if upon investigation the real transaction shall appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed, of his real equitable rights, unless it be in favor of a person who has been in fact injured and deceived by the misrep-

resentation." [Doe, ex dem. Duval's heirs v. McLoskey, 1 Ala. Rep. N. S. 736–7.] So in Prince v. Shepard, 9 Pick. Rep. 176, the debt described in a conveyance for the creditor's benefit exceeded the amount really due, yet it was held that this might be explained so as to rebut the presumption of fraud. The statement of the consideration in the mortgage at a sum much greater than what was really due, is at most only presumptive evidence of fraud. [Parker v. Barker, 2 Metc. Rep. 423.]

Although no consideration be mentioned in a deed, yet it is not for that cause void; for every deed imports a consideration, and it devolves on the party who alledges the reverse to offer proof of the want of it. [Boynton v. Rees, 8 Pick. Rep. 329; Clapp v. Terrell, 20 Pick. Rep. 250.] So it has been held that a conveyance originally void as against creditors in consequence of fraud, may acquire validity, if the fraudulent intent be abandoned, and the confirmation of the conveyance made for adequate consideration. [Oriental Bank v. Harkins, 3 Metc. Rep. 332.] And a mortgage or other transfer of property executed with intent to defraud creditors cannot be avoided by them, unless the grantee participated in the fraudulent intent. [Jones v. Norris, 2 Ala. Rep. 526; Harrison v. Phillip's Academy, 12 Mass. Rep. 456; Foster v. Hall, 12 Pick. Rep. 89; Bridge v. Eggleston, 14 Mass. Rep. 250; Johnson v. Johnson, 3 Metc. Rep. 63.] Nor can a fraudulent grantee be treated as a trustee of the grantor, if he has paid *bona fide*, debts of the grantor to the full amount of the property received—(Thomas v. Goodwin, 12 Mass. Rep. 140) —and if he has paid a less amount he shall be entitled to a deduction *pro tanto* if there are no paramount liens. [Parker v. Barker, 3 Metc. Rep. 423. See also Burnett v. Stanton & Pollard, 2 Ala. Rep. 190; Cummins & Cooper v. McCullough, 5 Alabama Rep. 324.]

Sometimes the question of fraud *vel non* is determined upon an inspection of the deed without the aid of extrinsic proof. [Ashurst v. Martin, 9 Porter's Rep. 566; Gazzam v. Poyntz, 4 Ala. Rep. 372.] But in the present case it is not insisted that the mortgage itself discovers a legal objection, but that it is defective, because it does not truly state the consideration: and this fact is brought to the view of the Court

by testimony *aliunde.* In this aspect of the case the existence of fraud must depend upon the intention of the parties as shown by the proof, or inferred from established facts. [See the cases last cited, also Wadsworth v. Marsh, 9 Conn. Rep. 481; Jackson v. Mather, 7 Cow. Rep. 304.]

If the view taken of the law be correct, there can be no question that the depositions explanatory of the circumstances under which the mortgage was executed, and for the purpose of showing the extent of the mortgagor's indebtedness, are clearly admissible. And it is equally clear that they do not show the complainant to be guilty of a fraud in obtaining the mortgage. The statement of an exaggerated consideration, in the language of some of the cases cited, is at most *prima facie* evidence of fraud, and may be repelled by showing the fairness of intention on the part of the mortgagee. This has been done by the testimony in the cause, which very satisfactorily shows that the complainant did not intend to deceive any one; and that the consideration was misstated, because the amount for which he was the surety of Herrington was unknown to them at the time the mortgage was executed.; and perhaps it was the only form in which the security could be obtained; the mortgagor may, and most probably did, intend to defraud his creditors, but this we have seen cannot prejudice the complainant, who did not concur in such a purpose. That there was a consideration for the mortgage, as well as the amount of it, is well established by the proof. The complainant claimed nothing more than was really due, and thus far we have seen his lien may be sustained.

The purchase by the complainant of two of the slaves embraced by the mortgage, cannot impair his lien as to the others. It cannot be inferred that he intended thereby to assist in defrauding the creditors of Herrington. The presumption from the proof is, that he esteemed the security sufficient for his indemnity without these slaves, or if not, that he considered it most beneficial to himself to purchase them in extinguishment of another debt that was due him from the mortgagor. Nor is fraud a legal conclusion from the fact, that the complainant became Herrington's surety in a bond for a writ of error, sued out to revise a judgment upon one of the notes against which it was the object of the mortgage to

indemnify him. Perhaps it may have been supposed that the judgment would be avoided *in toto,* the complainant absolved from liability to pay the note, and his lien of course discharged. Be this as it may, it would seem from the proof that he did not act from a sinister motive, but was forced to execute the bond in order to obtain the two slaves.

The complainant was certainly mistaken, in supposing that he could enforce the lien of his mortgae, by causing an execution to be levied on the mortgaged property, while there were older executions in the sheriff's hands against the mortgagor's estate. But this cannot operate as an estoppel, so as to preclude him from showing that he never intended to abandon the mortgage. The proof, instead of showing that he contemplated such a purpose, warrants the inference, that he supposed the execution when enforced for his benefit, acquired potency from the mortgage. This accounts for the solicitude felt and efforts made by the complainant, to cause the lands to sell for a fair market value at the sheriff's sale. He was doubtless of opinion that his interest as a mortgagee would prevent competition, and the advertisement put up in different places, was intended to encourage bidders by quieting their apprehensions as to the title.

We have seen that the evidence instead of connecting the complainant with the fraud (if any) which was purposed by Herrington, entirely exculpates him. The fact that the latter was embarrassed and conveyed his entire estate, considering, that the only object of the complainant was to indemnify himself against the consequences of his suretyship, cannot in any manner affect the validity of the mortgage. A party though indebted beyond his means of payment may prefer one creditor to all others, and transfer to him or for his security, all his property, where there are no paramount liens upon it. There may perhaps be cases, where the disproportion between the liability intended to be secured and the property conveyed is so great as to authorize the presumption of fraud; but the present is not a case of that character.

It is clear that the mortgage imparted no aid to the execution under which the complainant purchased, and consequently he acquired no title as against the judgment and older *fieri facias* under which Bonner claims. The purchase by Burns

20

of the slave Jane was good against an execution, the lien of which was not previously operative. This being the case, the complainant is remediless unless Chancery can interpose, and administer relief. From the cause, as presented to us, there is nothing attributable to him incompatible with honesty of intention; nor is any sufficient reason shown, why the sales to Bonner and Burns should not be avoided; and the purchases by the complainant declared to be null.; especially upon his stipulating that the property should sell for as much as it did under the execution sale at which he purchased. This being done, no objection is perceived in the present posture of the case to a foreclosure of the mortgage, and a decree for the sale of the property embraced by it.

That the cause may be proceeded in according to the principles of equity and the rules of procedure therein, the decree of the Court of Chancery is reversed, and the cause remanded, at the cost of the defendants in error.